# EXHIBIT A

1   Doug Rochen (SBN 217231)
    drochen@dicellolevitt.com
2   **DICELLO LEVITT LLP**
3   4747 Executive Drive, Suite 240
    San Diego, California 92121
4   Telephone: (619) 923-3939

5   Kenneth P. Abbarno*
    kabbarno@dicellolevitt.com
6   Justin Hawal*
    jhawal@dicellolevitt.com
7   **DICELLO LEVITT LLP**
8   8160 Norton Parkway, Third Floor
    Mentor, Ohio 44060
9   Telephone: (440) 953-8888

10  Marc Lipton*
    marc@liptonlaw.com
11  Kyle Kelly*
    kyle@liptonlaw.com
12  **LIPTON LAW**
13  18930 W. 10 Mile Road
    Southfield, Michigan 48075
14  Telephone: (248) 557-1688

15  Attorneys for Plaintiffs
    *Pro Hac Vice* application forthcoming
16  [Additional counsel appear on signature line.]

Electronically FILED by
Superior Court of California,
County of Los Angeles
1/30/2026 7:27 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk

17
               **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**
18
                  **FOR THE COUNTY OF LOS ANGELES**
19

20  EMILY SLUITER, individually and as       Case No:     26STCV03584
    successor-in-interest to HENRY JAMES
21  MASELLA SLUITER, *deceased*; DOUGLAS     **COMPLAINT FOR DAMAGES**
    SLUITER, AVERY SLUITER, and                1. **NEGLIGENCE**
22  MORGAN SLUITER, each individually,         2. **STRICT PRODUCTS LIABILITY –**
                                                  **DESIGN DEFECT**
23                                             3. **NEGLIGENCE – DESIGN DEFECT**
                            Plaintiffs,        4. **STRICT PRODUCTS LIABILITY –**
24         vs.                                    **FAILURE TO WARN**
                                               5. **NEGLIGENCE – FAILURE TO**
25  SNAP, INC., a Delaware corporation; and       **WARN**
    DOES 1 through 50, inclusive,              6. **BREACH OF IMPLIED WARRANTY**
26                                             7. **GROSS NEGLIGENCE**
                            Defendants.        8. **WRONGFUL DEATH**
27                                             9. **SURVIVAL ACTION**
28
                                             **DEMAND FOR JURY TRIAL**

                                  - 1 -

1    Plaintiffs EMILY SLUITER, individually and as successor-in-interest to HENRY JAMES
2    MASELLA SLUITER, *deceased*, ("Henry"); DOUGLAS SLUITER, AVERY SLUITER, and
3    MORGAN SLUITER, each individually (collectively, "Plaintiffs"), by and through undersigned
4    counsel, and for their Complaint against Defendant SNAP, INC., a Delaware corporation ("Snap");
5    and DOES 1 through 50, inclusive (collectively, "Defendants"), allege as follows:

6    **INTRODUCTION**

7    1.    On August 16, 2024, fourteen-year-old Henry James Masella Sluiter tragically took
8    his own life after falling victim to a "sextortion" scheme on Snap's social media application,
9    Snapchat.

10    2.    Due to Snapchat's defective design, the sextortionist was able create a false identity
11    on Snapchat and dupe Henry into believing that he was using the app to communicate with a fourteen-
12    year-old girl that was interested in developing a relationship with him.

13    3.    In fact, Henry was communicating with a fourteen-year-old boy that was using
14    Snapchat in its foreseeable and intended manner, to anonymously solicit explicit photos from Henry
15    and to inflict psychological and emotional harm on him.

16    4.    Due to Snapchat's intentionally addictive design that knowingly causes social
17    isolation, impulsive decision making, and other risk-taking behaviors, particularly in adolescents,
18    along with its purported disappearing content feature, Henry shared explicit content about himself
19    and was unable to cease communication with the sextortionist via Snapchat.

20    5.    After being duped into sending an explicit photo of himself via Snapchat's purported
21    disappearing content feature—which, in fact, allows users to screen-shot content against the sender's
22    wishes—the sextortionist threatened to release the photo to Henry's classmates and otherwise
23    terrorized Henry by threatening to disseminate other embarrassing details about his personal life.

24    6.    Snapchat's lack of meaningful age verification restrictions, lack of identity
25    verification, lack of parental controls, and its disappearing content design—all of which Snap knows
26    are features that appeal particularly to minors attempting to conceal content from their parents and
27    encourage impulsive behavior among minors to send content they later regret—foreseeably led to

28

- 2 -
COMPLAINT FOR DAMAGES

Henry's death. These defective design features also prevented both Henry's parents and the sextortionist's parents from intervening and providing Henry with the help that he needed.

7.     As a direct result of Snapchat's dangerously defective design, Henry developed suicidal ideations, suffered emotional distress, fright, shock, humiliation, physical harm, and death. His survivors, including his parents and siblings, also incurred medical, funeral, and burial expenses, as well as the loss of his society, companionship, and services.

8.     Plaintiffs bring this action on behalf of the decedent Henry James Masella Sluiter and themselves, as wrongful death heirs, for compensatory and punitive damages, alleging the following causes of action against Defendants: (1) Negligence; (2) Strict Products Liability – Design Defect; (3) Negligence – Design Defect; (4) Strict Products Liability – Failure to Warn; (5) Negligence – Failure to Warn; (6) Breach of Implied Warranty; (7) Gross Negligence; (8) Wrongful Death; and (9) Survival Action.

## **PARTIES**

9.     Plaintiff Emily Sluiter is the successor-in-interest to the decedent Henry James Masella Sluiter. (See Declaration of Emily Sluiter Pursuant to Code of Civil Procedure § 377.32, attached hereto as Exhibit "1".) Plaintiff Emily Sluiter is the mother (a wrongful death heir) of the decedent Henry James Masella Sluiter and is a resident of the City of Belmont, County of Kent, and State of Michigan.

10.     Plaintiff Douglas Sluiter is the father (a wrongful death heir) of the decedent Henry James Masella Sluiter and is a resident of the City of Belmont, County of Kent, and State of Michigan.

11.     Plaintiff Avery Sluiter is the brother (a wrongful death heir) of the decedent Henry James Masella Sluiter and is a resident of the City of Belmont, County of Kent, and State of Michigan.

12.     Plaintiff Morgan Sluiter is the sister (a wrongful death heir) of the decedent Henry James Masella Sluiter and is a resident of the City of Belmont, County of Kent, and State of Michigan.

13.     Plaintiffs are informed and believe, and thereupon allege, that at all times mentioned herein, Defendant Snap, Inc. ("Snap") was and continues to be a Delaware corporation with its principal place of business located at 3000 31st Street, Santa Monica, California 90405. Snap owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises,

1  promotes, supplies, and distributes the social media application, Snapchat. Snapchat is a product that

2  is widely available to consumers throughout the United States.

3        14.    The true names and/or capacities, whether individual, corporate, associate or otherwise

4  of Defendants DOES 1 through 50, inclusive, and each of them, are unknown to Plaintiffs, who

5  therefore sue said defendants by such fictitious names. Plaintiffs are informed and believe, and

6  thereupon allege, that each defendant fictitiously named herein as a DOE was legally responsible,

7  negligently or in some other actionable manner, for the events and happenings hereinafter referred to

8  and proximately thereby caused the injuries, emotional pain and suffering, as well as economic

9  damages to Plaintiffs as hereinafter alleged. Plaintiffs will ask leave of court to amend the complaint

10  to insert the true names and/or capacities of such fictitiously named defendants when the same have

11  been ascertained.

12  **JURISDICTION AND VENUE**

13        15.    The California Superior Court has jurisdiction over all Defendants, including DOES 1

14  through 50, because, based on information and belief, each is either a corporation and/or entity and/or

15  person organized under the laws of or having its principal place of business in the State of California,

16  a foreign corporation or association authorized to do business in California and registered with the

17  California Secretary of State, or that has sufficient minimum contacts in California, is a citizen of

18  California, or otherwise has intentionally availed itself of the California market so as to render the

19  exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play

20  and substantial justice.

21        16.    Venue is proper in this Court pursuant to California Code of Civil Procedure section

22  395.5 because, on information and belief, Defendants reside or maintain a place of business in the

23  County of Los Angeles.

24  **FACTUAL ALLEGATIONS**

25  **I.    Henry falls prey to a catfishing and sextortion scheme perpetrated by another minor on**

26  **Snapchat.**

27        17.    In the summer of 2024, Henry was fourteen-years-old and was preparing to begin ninth

28  grade. He spent his summer working his first job as a dishwasher for Archival Brewing in Belmont,

- 4 -

COMPLAINT FOR DAMAGES        **Exhibit A - 11**

1    Michigan. He also enjoyed spending time with his friends and frequenting the local YMCA to play

2    basketball.

3         18.    Henry was a triathlete and played basketball, track, and soccer. He did not have any

4    disciplinary issues and received good grades at school.

5         19.    As a teenager, like multitudes of similarly situated minors, he spent much of his spare

6    time interacting online, including using the social media platform Snapchat.

7         20.    On or around August 14, 2024, Henry began communicating through Snapchat with

8    another minor who fraudulently identified himself as a similar age female.

9         21.    In fact, the account belonged to a fourteen-year-old male who was using Snapchat to

10   contact other minors for the purpose of perpetrating a catfishing and sextortion scam.

11        22.    In perpetrating his catfishing and sextortion scam, the sextortionist communicated

12   with Henry and pretended to be a young lady who was interested in developing a relationship with

13   Henry. The minor sextortionist convinced Henry to send an explicit photo of himself to continue the

14   online relationship. In response and in hopes of developing a relationship with a young lady, Henry

15   agreed to do so.

16        23.    After the sextortionist received the photo, he screen-shotted it against Henry's wishes

17   and began threatening Henry and demanded that he send additional photos. If Henry refused, the

18   sextortionist threatened to spread the explicit photograph of Henry to classmates at Henry's school.

19        24.    The sextortionist also began terrorizing Henry with personal details about Henry that

20   Henry had not shared with the sextortionist.

21        25.    Distraught and devastated, Henry began messaging his close friends and informed

22   them of the catfishing and sextortion scheme. Notably, Henry began indicating through his messages

23   that he was struggling with suicidal ideations and felt desperate.

24        26.    One of Henry's friends became increasingly concerned and decided to inform his own

25   mother about Henry's messages. The mother then contacted the police, who were dispatched to

26   Henry's home.

27        27.    When the police arrived, Henry—in severe distress—ran behind a family camper

28   located in his backyard and shot himself in the left temple.

COMPLAINT FOR DAMAGES      **Exhibit A - 12**

28.     Although not immediately fatal, Henry suffered severe and permanent injuries, which required emergent treatment. Henry was hospitalized in the intensive care unit; eventually, he succumbed to his injuries, and died from the wounds.

29.     Henry's death was the direct consequence of Snapchat's defective design features, including, without limitation, its lack of meaningful age verification restrictions, lack of identity verification, lack of parental controls, and its disappearing content feature, as well as the horrible pressure, negative emotions, impulsive decision making, and the destructive impact on Henry's social development and emotions, proximately caused by the intentionally addictive design of Snapchat's social media platform.

## II.     Snapchat is a product that is defectively designed and is known to cause psychological harm to users, especially to minors.

30.     Snapchat is a social media application that was developed and produced by the labor of Snap's social media development engineers, making it a product under applicable law.

31.     Snapchat was created by three college students in 2011 as a disappearing-message chat application that was marketed as "temporary social media" that allows users to show a more authentic, unpolished, and spontaneous side of themselves.[1]

32.     Snap describes itself as a camera company, and Snapchat, its primary product, allows users to send text, picture, and video messages called "snaps," which purportedly disappear after being viewed by the recipients.

33.     Snap promotes and markets Snapchat's ephemeral messaging system as enabling users to showcase their genuine, unfiltered, and spontaneous selves.

34.     Snapchat is one of the world's most widely used apps. Snap estimates that Snapchat has 453 million daily active users, including 100 million daily active users in North America.[2]

---

[1] Jenna Wortham, *A Growing App Lets You See It, Then You Don't*, N.Y. Times (Feb. 9, 2013) <https://www.nytimes.com/2013/02/09/technology/snapchat-a-growing-app-lets-you-see-it-then-you-dont.html?_r=0> (as of Jan. 23, 2026).
[2] Snap, Inc., 2024 Investor Presentation (Feb. 4, 2025) p. 14 <https://s25.q4cdn.com/442043304/files/doc_financials/2024/q4/2024-Investor-Presentation.pdf> (as of Jan. 23, 2026).

Snapchat "reaches over 75% of the 13- to 34-year-old population in more than 25 countries" and reaches approximately a quarter of all smartphone users in the United States.[3]

35.     In 2014, Snap commenced displaying advertisements on Snapchat. Since then, Snapchat's business model has primarily relied on generating revenue from advertising. In 2024, 60% of Snapchat's revenue originated from North America, and 91% of that revenue was generated through advertising dollars.[4] Snapchat generated $5.3 billion in revenue in 2024.[5]

**A. Snapchat is intentionally designed to be addictive to users, especially to minors, in order to maximize advertising revenue and profits.**

36.     Snapchat is a product. It is designed, coded, engineered, manufactured, produced, assembled, and placed into the stream of commerce. It was designed to be used or consumed by the public as part of the regular business of Snap. It is mass-marketed to be used by billions of consumers, and is intentionally designed and advertised to appeal, in particular, to adolescents.

37.     Snapchat is akin to a tangible product. When installed or used on devices, it has a definite appearance and location and is operated by a series of clicks, swipes, and user-interface actions. It is personal, moveable, and downloadable.

38.     According to Tristen Harris, a former Google Design Ethicist, social media product designers maximize capitalizing on user attention by "play[ing] your psychological vulnerabilities (consciously and unconsciously) against you in the race to grab your attention."[6]

39.     Snapchat is designed to be addictive. Based upon its design, interactions with the app can release large amounts of dopamine into a user's brain's reward pathway—much like highly addictive substances.[7]

---

[3] Snap, Inc., *2024 Investor Presentation* (Feb. 4, 2025) pp. 6, 13, 20 <https://s25.q4cdn.com/442043304/files/doc_financials/2024/q4/2024-Investor-Presentation.pdf> (as of Jan. 23, 2026).
[4] See Snap, Inc., *2024 Annual Report* (Feb. 4, 2025) p. 18 <https://s25.q4cdn.com/442043304/files/doc_financials/2024/q4/2024-Annual-Report.pdf> (as of Jan. 23, 2026); Matthew Johnston, *How Snapchat Makes Money*, Investopedia (updated Dec. 5, 2024) <https://www.investopedia.com/articles/investing/061915/how-snapchat-makes-money.asp> (as of Jan. 23, 2026).
[5] Snap, Inc., *2024 Annual Report* (Feb. 4, 2025) pp. 92-93 <https://s25.q4cdn.com/442043304/files/doc_financials/2024/q4/2024-Annual-Report.pdf> (as of Jan. 23, 2026).
[6] Tristan Harris, *How Technology is Hijacking Your Mind – from a Magician and Google Design Ethicist*, Medium, Thrive Global (May 18, 2016) <https://medium.com/thrive-global/how-technology-hijacks-peoples-minds-from-a-magician-and-google-s-design-ethicist-56d62ef5edf3> (as of Jan. 23, 2026).
[7] See, e.g., Jim Zhao, et al., *Risk Factors Associated with Social Media Addiction: An Exploratory Study*, Frontiers in Psychology, vol. 13 (Apr. 14, 2022) <https://pmc.ncbi.nlm.nih.gov/articles/PMC9046602/pdf/fpsyg-13-837766.pdf> (as

40.     Addiction to Snapchat is intentional: the more an individual interacts with the app, the more money Snap makes because each interaction with a user allows more opportunities to monetize that user's interactions to sell advertising access.[8]

41.     Young people are particularly susceptible to social media addiction and Snap deliberately targets children, teenagers, and young adults in its marketing for Snapchat, recognizing their inclination towards instant gratification processes, which ultimately benefits Snap's advertising business.

42.     Snapchat's design is carefully tailored to maximize user engagement, particularly among minors. The platform employs various strategies that entice young individuals to spend extended periods of time using the app. The addictive nature of Snapchat's features negatively impacts the well-being and development of young users.

43.     Snapchat's algorithms play a vital role in the race for attention, using machine learning, artificial intelligence, and data science to predict user demographics and send users personalized content recommendations and ads based on personal preferences and the likelihood that the user will want to see the suggested content.[9]

44.     Another key tactic employed by Snapchat is the implementation of app features designed to maximize user engagement. One such feature is "streaks," which are essentially continuous back-and-forth exchanges of snaps between users. Streaks create a sense of obligation and social pressure for users to maintain daily communication, leading to increased app usage. This

of Jan. 23, 2026); Bruce Goldman, *Addictive potential of social media, explained*, Stanford Medicine News Center (Oct. 29, 2021) <https://med.stanford.edu/news/insights/2021/10/addictive-potential-of-social-media-explained.html> (as of Jan. 23, 2026); Jena Hilliard, *New Study Suggests Excessive Social Media Use Is Comparable to Drug Addiction*, Addiction Center (updated Nov. 25, 2025) <https://www.addictioncenter.com/news/2019/09/excessive-social-media-use/> (as of Jan. 23, 2026); Sherri Gordon, *How to Know If You Have an Internet Addiction and What to Do About It*, People, Inc., Verywell Mind (updated Aug. 16, 2023) <https://www.verywellmind.com/excessive-social-media-use-4690882> (as of Jan. 23, 2026).

[8] Catherine Price, *Trapped—the secret ways social media is built to be addictive (and what you can do to fight back)*, BBC Science Focus Magazine, Issue 321 (updated Oct. 29, 2018) <https://www.sciencefocus.com/future-technology/trapped-the-secret-ways-social-media-is-built-to-be-addictive-and-what-you-can-do-to-fight-back> (as of Jan. 23, 2026).

[9] Dorcas Adisa, *Everything you need to know about social media algorithms*, Sprout Social (Oct. 30, 2023) <https://sproutsocial.com/insights/social-media-algorithms/> (as of Jan. 23, 2026).

1 constant need to keep streaks alive can disrupt real-life interactions, impede productivity, and

2 contribute to a sense of dependency on the platform.[10]

3    45.    Furthermore, Snapchat's use of gamification elements, such as trophies and rewards

4 for achieving certain milestones, encourages users to continually engage with the app. By

5 incorporating elements of competition and achievement, Snapchat taps into the psychological desire

6 for recognition and accomplishment, driving users, especially minors, to dedicate significant time and

7 attention to the platform.[11]

8    46.    Snapchat's user interface itself also contributes to increased engagement among

9 minors. The app uses a "streak counter" that displays the number of consecutive days a user has

10 maintained a streak with another user. This visual representation creates a sense of accomplishment

11 and fuels the fear of losing the streak, compelling users to frequently check and interact with the app

12 to preserve their streaks.[12]

13    47.    In fact, Snapchat's design uses social metrics and other manipulation techniques to

14 induce compulsive use in teenagers. For instance, Snapchat rewards users through features like

15 Snapscores, Snap Streaks, and Snap Awards when users engage with Snapchat and punish users when

16 they fail to engage.[13]

17    48.    These "social rewards" cause a dopamine rush that impacts the ventral striatum in the

18 brain which causes teens to seek out these rewards.[14] In fact, research shows that teens are more likely

19 to become isolated and feel lonelier when they are not receiving approval or acceptance via these

20 "social awards"[15]

21

22 [10] Jennifer Powell-Lunder, Psy.D., *Caution: Your Tween May be Stressing Over Snap Streaks*, Psychology Today (Mar.
23 26, 2017) <https://www.psychologytoday.com/us/blog/lets-talk-tween/201703/caution-your-tween-may-be-stressing-over-snap-streaks> (as of Jan. 23, 2026).
[11] Dayana Hristova, et al., *"Why did we lose our snapchat streak?". Social media gamification and metacommunication*,
24 ScienceDirect, Computers in Human Behavior Reports, vol. 5, (Mar. 2022) art. 100172
<https://www.sciencedirect.com/science/article/pii/S2451958822000069> (as of Jan. 23, 2026).
25 [12] William Antonelli, *How to start a Snapchat Streak and keep it alive to boost your Snap Score*, Business Insider (Aug.
18, 2022) <https://www.businessinsider.com/guides/tech/snapchat-streak> (as of Jan. 23, 2026).
26 [13] Nir Eyal, et al., *The Secret Psychology of Snapchat*, Nir And Far (May 4, 2015) <https://www.nirandfar.com/psychology-of-snapchat/> (as of Jan. 23, 2026).
27 [14] Zara Abrams, *Why young brains are especially vulnerable to social media,* American Psychological Assn. (updated
Aug. 3, 2023) <https://www.apa.org/news/apa/2022/social-media-children-teens> (as of Jan. 23, 2026).
28 [15] See Cory Turner, *10 things to know about how social media affects teens' brains*, NPR (Feb. 16, 2023)
<https://www.npr.org/2023/02/16/1157180971/10-things-to-know-about-how-social-media-affects-teens-brains> (as of
Jan. 23, 2026); Emma Armstrong-Carter, et al., *Momentary links between adolescents' social media use and social*

- 9 -

49.     Furthermore, Snapchat's disappearing messages themselves create a compulsion for individuals to engage more with Snapchat. Because Snaps typically disappear within ten seconds of being viewed, users feel compelled to reply immediately.[16]

50.     Social media companies, including Snap, have known for a long time that their products—not only are designed to be addictive—but are addictive.

**B. Social media addiction, including addiction to Snapchat, particularly harms the mental health of young people.**

51.     Young people aged 16 to 25 have the highest rates of social media-related mental illness.[17] Perhaps most tellingly about the negative effects that social media has on children, many tech moguls do not allow their children to use social media.[18]

52.     Social media increasingly replaces physical human interactions, leading to feelings of isolation, loneliness, and fear.[19]

53.     Chris Said, who has a Ph.D. in psychology from Princeton University and who has worked at both Facebook and Twitter, noted that "[s]ocial media was like a nuclear bomb on teen social life. . . . I don't think there's anything in recent memory, or even distant history, that has changed the way teens socialize as much as social media."[20]

54.     Adolescents spend between five to seven hours per day on social media, and roughly half of them believe that they spend "too much time" on social media.[21]

---

*experiences and motivations: Individual differences by peer susceptibility*, American Psychological Assn., Developmental Psychology, vol. 59(4) (Apr. 2023) pp. 707-719 <https://psycnet.apa.org/record/2023-28589-001> (as of Jan. 23, 2026).
[16] Nir Eyal, et al., *The Secret Psychology of Snapchat,* Nir And Far (May 4, 2015) <https://www.nirandfar.com/psychology-of-snapchat/> (as of Jan. 23, 2026).
[17] Kevin Moore *The Alarming Reality of Social Media Addiction Statistics*, The International Spiritual News Network ("The ISNN") (May 10, 2023) <https://theisnn.com/the-alarming-reality-of-social-media-addiction-statistics/> (as of Jan. 29, 2026).
[18] Kristin Conrad, *The Real Reason Tech Moguls Don't Let Their Kids on Social Media*, The List (Dec. 6, 2021) <https://www.thelist.com/677684/the-real-reason-tech-moguls-dont-let-their-kids-on-social-media/> (as of Jan. 29, 2026).
[19] Alice G. Walton, *Social Media May Make You Feel Socially Isolated: Study*, Forbes (Mar. 6, 2017) <https://www.forbes.com/sites/alicegwalton/2017/03/06/social-media-and-social-isolation-go-hand-in-hand-but-which-comes-first/?sh=23dcc79d1785> (as of Jan. 29, 2026).
[20] Michaeleen Doucleff, *The truth about teens, social media and the mental health crisis*, NPR (Apr. 25, 2023) <https://www.npr.org/sections/health-shots/2023/04/25/1171773181/social-media-teens-mental-health> (as of Jan. 29, 2026).
[21] Tonya Mosley and Serena McMahon, *Social Media Use Linked to Anxiety, Depression Among Teens, New Study Finds*, WBUR (Jan. 9, 2020) <https://www.wbur.org/hereandnow/2020/01/09/social-media-anxiety-depression-teens> (as of Jan. 29, 2026).

55.    In a Harvard Business Review article discussing social media addiction, for example,

> [P]sychologist Nicholas Kardaras explains that the people behind
> Facebook and Instagram not only designed their platforms to be wildly
> addictive but have kept them that way even amid mounting evidence
> that social media overuse has a horrible effect on people's mental and
> physical well-being.  (The same is true for Twitter, YouTube, TikTok,
> and most other social media.)[22]

56.    Social media has been linked to impulsive decision-making and risk-taking behavior.  Specifically, research has found that individuals who report more time on social media demonstrate a higher preference towards immediate, but smaller rewards at the expense of delayed, but larger rewards.[23]

57.    The addictive nature of the applications and platforms is especially damaging for teens and young people. MRI brain studies show that students who use social media more frequently had increased activation points of their brain, "possibly making them more prone to peer feedback and hypersensitivity and possibly leading to changes in impulse control and regulation, according to ABC News chief medical correspondence Dr. Jennifer Ashton."[24]

58.    ***Social media usage's dopamine rush impacts the ventral striatum.*** Between the ages of ten and twelve, changes in the brain make social rewards—compliments on clothing or positive feedback—start to feel more satisfying.  Specifically, receptors for oxytocin and dopamine multiply in a part of the brain called the ventral striatum, making preteens extra sensitive to attention and admiration from others.[25]

59.    Social media provides a mechanism to experience these "social rewards," giving the ventral striatum "a dopamine and oxytocin rush whenever we experience social rewards."[26]  And, "[r]ight next door to the ventral striatum lies the ventral pallidum, a region of the brain key for

---

[22] Kelsey Gripenstraw, *Our Social Media Addiction*, Harvard Business Review (Nov. - Dec. 2022) <https://hbr.org/2022/11/our-social-media-addiction> (as of Jan. 29, 2026).
[23] Deng Pan, et al., *Time on social media networking sites is associated with impulsive decision-making,* Behaviour & Information Technology, vol. 44(9) (July 5, 2024) pp. 1760-1765 <https://www.tandfonline.com/doi/full/10.1080/0144929X.2024.2374006> (as of Jan. 29, 2026).
[24] Haley Yamada and Katie Kindelan, *Social media use linked to brain changes in teens, study finds*, ABC News (Jan. 5, 2023) <https://digital.abcaudio.com/news/social-media-use-linked-brain-changes-teens-study-finds> (as of Jan. 29, 2026).
[25] Zara Abrams, *Why young brains are especially vulnerable to social media*, American Psychological Association (updated Aug. 25, 2022) <https://www.apa.org/news/apa/2022/social-media-children-teens> (as of Jan. 29, 2026).
[26] *Ibid.*

COMPLAINT FOR DAMAGES                                         **Exhibit A - 18**

motivating action. These structures, which lie beneath the more recently evolved cortex, are older parts of the brain that drive instinctual behaviors."[27]

60.     Teens continue to seek out approval and acceptance via these "social rewards" on social media and, if they do not receive them, become isolated and feel lonelier.[28]

61.     ***Social media usage creates pressure and negative emotions, and can hinder healthy development of the prefrontal cortex.*** Social media platforms often promote a culture of comparison, where teenagers constantly compare themselves to their peers in terms of appearance, achievements, and social status.  This continuous exposure to idealized and curated representations of others' lives can lead to feelings of inadequacy, low self-esteem, and increased social anxiety. The prefrontal cortex, involved in self-reflection and emotional regulation, can be impacted by the constant pressure and negative emotions resulting from social comparison, potentially hindering healthy brain development.[29]

62.     ***Social media usage leads to impulsive decision-making and risk-taking behavior.*** The prefrontal cortex is responsible for regulating impulsive behaviors and assessing risks.  Social media platforms often encourage instant gratification, impulsive reactions, and seeking novelty.  This can contribute to a greater inclination towards impulsive decision-making and risk-taking behavior, as teenagers may engage in potentially harmful activities driven by the desire for social validation or the need to conform to online trends. Such behavior can negatively impact the development of the frontal cortex, which is responsible for evaluating consequences and exercising self-control.[30]

---

[27] *Ibid.*

[28] See, e.g., Cory Turner, *10 things to know about how social media affects teens' brains*, NPR (Feb. 16, 2023 <https://www.npr.org/2023/02/16/1157180971/10-things-to-know-about-how-social-media-affects-teens-brains> (as of Jan. 29, 2026); Written Testimony of Mitch Prinstein, Ph.D., ABPP, Chief Science Officer, American Psychological Association, *Protective Our Children Online*, U.S. Senate Committee on Judiciary (Feb. 14, 2023) <https://www.judiciary.senate.gov/imo/media/doc/2023-02-14%20-%20Testimony%20-%20Prinstein.pdf> (as of Jan. 29, 2026).

[29] See Michelle Achterberg, et al., *Longitudinal associations between social media use, mental well-being and structural brain development across adolescence*, ScienceDirect, Developmental Cognitive Neuroscience, vol. 54, (Apr. 2022) art. 1011088 <https://www.sciencedirect.com/science/article/pii/S1878929322000329?via%3Dihub> (as of Jan. 29, 2026). See also Eveline A. Crone and Emily A. Konijn, *Media use and brain development during adolescence*, Nature Communications (Feb. 21, 2018) <https://www.nature.com/articles/s41467-018-03126-x> (as of Jan. 29, 2026).

[30] Kathryn E. Lorenz, MD, *Screen Addiction Affects Physical and Mental Health*, Premier Health (May 11, 2023) <https://www.premierhealth.com/your-health/articles/health-topics/screen-addiction-affects-physical-and-mental-health> (as of Jan. 29, 2026).

63. ***Social media usage reduces face-to-face interactions, retarding the development of social skills.*** Excessive reliance on social media for social interactions can reduce face-to-face interactions, which are crucial for the development of social skills and emotional intelligence. The prefrontal cortex is involved in understanding and navigating social dynamics, including interpreting facial expressions, body language, and non-verbal cues. Reduced face-to-face interactions may limit opportunities for teenagers to develop and refine these social skills, potentially affecting the maturation of the frontal cortex, and possibly leading to the development of narcissistic tendencies.[31]

64. The detrimental effects of Snapchat's design on minors are significant. Excessive usage of the platform can lead to decreased face-to-face social interactions, diminished focus on academic or extracurricular activities, and a heightened risk of developing addictive behaviors. Moreover, constant exposure to carefully curated and filtered images on Snapchat can contribute to feelings of insecurity, a need for acceptance among peers, fear of being ostracized by peers, and a distorted sense of reality for young users.

65. Consequently, Snapchat is "ranked among the worst social media for mental health."[32]

**C. Snapchat's defective design knowingly causes vulnerable minors, like Henry, to fall prey to schemes like catfishing and sextortion.**

66. Snapchat further contains a number of features which foreseeably cause teenagers harm above and beyond harms inherent in addiction and compulsive use.

67. Snapchat's main feature, the "Snap," allows users to send and receive disappearing audiovisual messages. Prior to sending a Snap, a user can designate a period of time that the recipient will be allowed to view the Snap. Once the allotted time designated by the user expires, the Snap will disappear forever.

---

[31] See, e.g., Anthony Silard, Ph.D., *The Role of Social Media in Our Empathy Crisis*, Psychology Today (July 11, 2022) <https://www.psychologytoday.com/us/blog/the-art-living-free/202207/the-role-social-media-in-our-empathy-crisis> (as of Jan. 29, 2026); Yamila Lezcano LHMC, *How Social Media Affects Mental Health in Adolescents*, Psychology Today (Aug. 25, 2021) <https://www.psychologytoday.com/us/blog/becoming-resilient/202108/how-social-media-affects-mental-health-in-adolescents> (as of Jan. 29, 2026).
[32] The Solstice Team, *Snapchat Addiction: The Darkside of a Popular Worldwide App*, Solstice RTC, Solstice West (Oct. 26, 2017) <https://solsticertc.com/snapchat-addiction-darkside-popular-worldwide-app/> (as of Jan. 29, 2026) [stating that "Snapchat ranked among the worst social media for mental health"]. See also Julie Kelly, *Confronting my daughter's addiction. To Snapchat.*, Huffington Post (updated Feb. 2, 2017) <https://www.huffpost.com/entry/confronting-my-daughters_b_9138986> (as of Jan. 29, 2026).

- 13 -

68.    Snapchat's central and defining feature, the "Snap," allows users to send and receive ephemeral, or "disappearing" audiovisual messages. That feature foreseeably and often drives users to exchange sexually explicit "Snaps," sometimes called "sexts" even though they are photos. To the public, Snapchat became known as the "sexting" app, which Snap knew or should have known.[33]

69.    Snapchat's limited display time reduces teenagers' communication apprehension and encourages users to send photos depicting inappropriate or sexual behavior.[34] Sexting is a prime example, but cyberbullying, underage alcohol consumption, and illicit use of narcotics are also commonly the subject of Snaps. A 2016 survey of pre-teens and teens ages 12-17 found that "dick pics" were among some of the unwanted content that users commonly receive while using the app.[35]

70.    Although Snaps have the ability and design to disappear after a certain period of time, the Snap recipient has the ability to save or record them prior to their deletion without the consent of the sender. This is particularly harmful to teenagers, who oftentimes rely on Snap's representations when taking and sending photos, and who only learn after the fact that recipients have the means to save photos or videos. In some cases, this feature facilitates sexual exploitation.

71.    Snap could, but does not, warn users, including children and teenagers, that Snaps may not necessarily disappear.

72.    In addition, Snapchat's feature known as "Find Friends" recommends new and sometimes random accounts to add to a user's profile. The Find Friends feature encourages users to expand their friend base to increase their Snapscore by interacting with an ever-expanding group of friends, which—in addition to expanding their time online—can result in exposure to strangers. Teenagers can appear in another user's Find Friends suggestions.[36]

---

[33] See, e.g., Megan Dickey, *Let's Be Real: Snapchat is Totally Used for Sexting,* Bus. Insider (Nov. 30, 2012) <https://www.businessinsider.com/snapchat-growth-sexting-2012-11> (as of Jan. 29, 2026); Billy Gallagher, *No, Snapchat Isn't About Sexting, Says Co-Founder Evan Spiegel*, TechCrunch (May 12, 2012), <https://techcrunch.com/2012/05/12/snapchat-not-sexting/b> (as of Jan. 29, 2026) [describing an interview in which journalist asked the CEO of Snap about the product's potential use for sexting].

[34] See Vaterlaus, et al., *"Snapchat is more personal": An exploratory study on Snapchat behaviors and young adult interpersonal relationships*, ScienceDirect, Computers in Human Behavior, vol. 62 (Sept. 2016) pp. 594-601 <https://www.sciencedirect.com/science/article/abs/pii/S0747563216303041> (as of Jan. 29, 2026).

[35] Kofoed, et al., *A snap of intimacy: Photo-sharing practices among young people on social media,* First Monday, vol. 21(11) (Nov. 7, 2016) <https://firstmonday.org/ojs/index.php/fm/article/view/6905> (as of Jan. 29, 2026).

[36] Snap, Inc., *What is Find Friends?*, Snapchat Support <https://help.snapchat.com/hc/en-us/articles/35382503314580-What-is-Find-Friends> (as of Jan. 29, 2026).

- 14 -

COMPLAINT FOR DAMAGES

73.     Users, including those engaging in catfishing and sextortion, have utilized the Find Friends feature to find random teenagers they can target for their catfishing and sextortion schemes.

74.     Despite this danger, Snap designed Find Friends because it increases the odds that users will add friends, send more Snaps, and spend more time using Snapchat.

75.     Furthermore, Snapchat's disappearing-content design, while appealing to minors, makes it more difficult for parents to monitor their children's social-media activity. This disappearing-content design has also encouraged exploitation and predatory behavior. In fact, studies have shown that Snapchat users believe their conduct is hidden and feel empowered to engage in behavior they otherwise wouldn't through the product without fear of getting caught.[37]

76.     These feelings are promoted by design. Snap intends for the product's disappearing messaging to entice users to share highly personal photos and information that many users would otherwise feel uncomfortable sharing on "higher-stake" apps.[38] Studies have also found that that "close ties" generated between teenagers on Snapchat foster the conditions for grooming and other predatory behavior.[39]

77.     Collectively, these product features promulgate communication and conduct with a false sense of intimacy between users and encourage users with improper motives to use Snapchat to target minors for grooming, sexual exploitation, catfishing, sextortion, and other inappropriate activity.

**D. Snapchat's design lacks meaningful age verification restrictions, identity verification, and parental controls in order to appeal to young users.**

78.     Snapchat has not officially incorporated age verification as a feature. Instead, users are required to self-declare their age by entering their date of birth when signing up, allowing young users to provide false dates of birth to gain access to the app. Snap has acknowledged that this method is not foolproof and has faced criticism for its effectiveness in preventing underage users from signing

---

[37] Salman Aslam, *Snapchat by the Numbers: Stats, Demographics & Fun Facts,* Omincore Agency (updated Jan. 10, 2024) <https://www.omnicoreagency.com/snapchat-statistics/> (as of Jan. 29, 2026).
[38] Evelyn Lopez, et al., *The Gratifications of Ephemeral Marketing Content, the Use of Snapchat by the Millennial Generation and Their Impact on Purchase Motivation*, Global Bus. Rev., vol. 25(6) (Apr. 10, 2021) pp. 1440-1451 <https://journals.sagepub.com/doi/10.1177/09721509211005676> (as of Jan. 29, 2026).
[39] *Ibid.*

COMPLAINT FOR DAMAGES                                          Exhibit A - 22

1  up for the app. And, in any event, Snapchat only restricts accounts to young people who are under the

2  age of 13 so that it can continue to market the app to its primary demographic, ages 13-24.[40]

3    79.    Snapchat's design also lacks any meaningful parental controls for parents to ensure

4  that their children are using the app safely. To start, the lack of meaningful age verification allows

5  children to easily sign-up for the app—regardless of their age—without their parents' knowledge or

6  consent.

7    80.    For those parents who are aware of their child's use of Snapchat, Snapchat's "Family

8  Center" is the platform's main parental control feature. It allows parents to see who their child is

9  chatting with and how often, but does not allow them to read or see the actual messages being sent

10  and received.[41]

11    81.    Furthermore, to access "Family Center," both the parent and child must have Snapchat

12  accounts, and the child must accept the parent's request, meaning the child is permitted to continue

13  to use the app without the feature enabled so long as the child does not accept the parent's request.[42]

14    82.    Snapchat's design also allows users to create false identities on Snapchat by using fake

15  names, photos, or other details to hide their true identity.[43] This further prevents parents from

16  discovering whether their child is using Snapchat by, for example, searching for their child on the

17  app.

18    83.    Snapchat's lack of identity verification also allows users to impersonate others.

19  Snapchat permits users to create accounts using either their phone number or email address. If

20  someone has access to another person's phone number or email address, they can use that information

21  to create an imitation Snapchat account that impersonates that individual either for fun or to cause

22  harm.

23

---

24  [40] Snap, Inc., *Frequently Asked Questions*, Snapchat Safety Hub, Parents <https://parents.snapchat.com/snapchat-family-safety-faq#:~:text=Teens%20must%20be%20at%20least%2013%20to%20create,you%20make%20an%20informed%

25  20decision%20for%20your%20family> (as of Jan. 29, 2026). See also *Snapchat Global Users Statistics 2025 | Snapchat Demographics*, The Global Statistics, Social Media <https://www.theglobalstatistics.com/snapchat-global-users-

26  statistics> (as of Jan. 29, 2026).
  [41] *Everything parents need to know about Snapchat*, Parent Zone (Dec. 15, 2025) <https://parentzone.org.uk/article/

27  snapchat> (as of Jan. 29, 2026).
  [42] *Ibid.*

28  [43] Pete Mitchell, *How Can You Find Out Who is Behind a Fake Snapchat Account*, TechCult (July 4, 2023) <https://techcult.com/how-can-you-find-out-who-is-behind-a-fake-snapchat-account/#:~:text=%EE%80%80Yes%EE%80%81.%20It%20is%20possibl> (as of Jan. 29, 2026).

84. Once the imitation account is created, a user may use the account for a number of inappropriate purposes, including, but not limited to, the following:

    a. **Impersonation**: Someone may create an imitation account to impersonate another person, either for fun or to cause harm. They may use the account to send inappropriate messages, post embarrassing photos or videos, or otherwise damage the person's reputation;

    b. **Scams**: Scammers may create inauthentic accounts to trick people into giving them money or personal information. They may pose as a celebrity, a company, or a friend in order to gain the victim's trust;

    c. **Cyberbullying**: Phony accounts can also be used for cyberbullying. Bullies may use these types of accounts to harass or intimidate others anonymously; and

    d. **Catfishing**: Catfishing is when someone creates a phony online persona to deceive others. This can be for romantic purposes or simply to gain attention. These accounts can be used for catfishing by pretending to be someone else and engaging in romantic or sexual conversations.[44]

85. Determining the person behind a counterfeit Snapchat account can be difficult, and there is no guarantee that users will be able to do so. Consequently, while fake Snapchat accounts can be traced, it is a challenging process. Snapchat purports to prioritize user privacy and only discloses information to law enforcement if it receives a valid legal request from law enforcement.[45]

86. Upon information and belief, Snap has the ability to implement meaningful age verification, identity verification, and parental control features, but chooses not to do so because such features will decrease its primary demographic and, consequently, reduce advertising revenue and profits.

### III. Snapchat's defective design was a substantial factor in causing Henry's death.

87. Snap knows that Snapchat's defective design allows impersonators to use Snapchat to

---

[44] Pete Mitchell, *How Can You Find Out Who is Behind a Fake Snapchat Account*, TechCult (July 4, 2023) <https://techcult.com/how-can-you-find-out-who-is-behind-a-fake-snapchat-account/#:~:text=%EE%80%80Yes%EE%80%81.%20It%20is%20possibl> (as of Jan. 29, 2026).
[45] *Ibid.*

COMPLAINT FOR DAMAGES        **Exhibit A - 24**

1  take advantage of children's addiction to social media as well as impulsive decision-making

2  tendencies, which are amplified by Snapchat's defective design.

3      88.    From July to December 2024 alone, Snap's Trust and Safety team took a total of

4  6,346,508 enforcement actions globally, including 1,224,502 enforcement actions for child sexual

5  exploitation and 678,717 enforcement actions for impersonation.[46]

6      89.    The FBI has warned that "financial sextortion … mainly occurs on digital platforms

7  where children are already spending their screen time, like social media, gaming websites, or video

8  chat applications. On these platforms, predators often pose as girls of a similar age and use fake

9  accounts to target young boys, deceiving them into sending explicit photos or videos. The predator

10  then threatens to release the compromising materials unless the victim sends payment."[47]

11      90.    This is precisely what happened to Henry in this case: the sextortionist used Snapchat

12  to deceive Henry into sending explicit photos and terrorized him with threats of releasing the photos

13  to his classmates.

14      91.    Snapchat's defective design features that fail to protect minors and help impersonators

15  connect with children facilitated the risk of impersonation and sextortion to Henry and the resulting

16  psychological and physical harm he suffered.

17      92.    Snapchat's lack of age verification for children over the age of 13 and lack of

18  meaningful parental controls allowed Henry to create a Snapchat account without his parents'

19  knowledge or consent and prevented them from monitoring Henry's activity on Snapchat to ensure

20  he was using the app safely.

21      93.    Snapchat's lack of meaningful mechanisms to prevent sham accounts (or warn users

22  of the existence of such accounts and scams) and verify the identities of users allowed the sextortionist

23  to easily create a false account and anonymously victimize Henry via the catfishing and sextortion

24  scheme.

25

26  _____

27  [46] Snap Inc., *Transparency Report, January 1, 2025 – June 30, 2025* (Dec. 1, 2025) <https://www.snap.com/en-US/privacy/transparency> (as of Jan. 29, 2026).

28  [47] Federal Bureau of Investigation (FBI) National Press Office, *International Law Enforcement Agencies Issue Joint Warning about global financial sextortion crisis,* FBI (Feb. 7, 2023) <https://www.fbi.gov/news/press-releases/international-law-enforcement-agencies-issue-joint-warning-about-global-financial-sextortion-crisis> (as of Jan. 29, 2026).

COMPLAINT FOR DAMAGES                                        **Exhibit A - 25**

94.    Snapchat's "Find Friends" feature, which matches and recommends connections between people with no known real-world connection, caused Henry to send snaps to the sextortionist by encouraging Henry to connect with new users and spend time on Snapchat sending snaps to strangers, resulting in the sextortionist anonymously victimizing Henry via the catfishing and sextortion scheme.

95.    Snapchat's misleading disappearing content feature provided Henry with a false sense of security and emboldened him to send the sextortionist sexual content that he later regretted and allowed the sextortionist to save that content without Henry's consent. Snapchat's disappearing-content design feature also prevented Henry's friends, family, teachers, and other caregivers from uncovering the sextortion scheme because Snapchat's disappearing messages made it impossible for messages to be discovered by others who could provide help.

96.    All of these defective design features were exacerbated by Snapchat's intentionally addictive design. For instance, Snapchat's "social features" such as its Snapscores, Snap Streaks, and Snap Awards caused Henry to send snaps to the sextortionist because these "social features" create a false sense of approval and acceptance. Snap is aware that teenagers seek out high Snapscores, Snap Streaks, and other Snap Awards.

97.    Snapchat's addictive design also caused social pressure, a sense of isolation, a fear of ostracization, impulsive decision making, and a destructive impact on Henry's social development and emotions, leading to suicidal ideations and, ultimately, Henry's death.

98.    Snap does nothing warn users about the dangers associated with Snapchat nor the risks of interacting with sham accounts and the dangers of sending explicit pictures to such accounts, and provides no easily accessible design or warning mechanism to report such an account after a scam is initiated.

99.    Sextortionists use Snapchat because they are generally aware that Snapchat's defective design, lack of warnings, and lack of other reasonable safety features provides a perfect conduit and opportunity to commit catfishing and sextortion schemes. Snap has known for years about the prevalence of catfishing and sextortion on Snapchat, yet it has taken insufficient steps to design its product with safety features and/or warnings which would protect its users, including Henry.

COMPLAINT FOR DAMAGES                    **Exhibit A - 26**

100.    Snap's failure to design Snapchat with sufficient protections which would prevent users from engaging in such fraudulent behavior was a substantially contributing factor and caused Henry's wrongful death.

101.    There was nothing preventing these measures, design changes, and/or reasonable warnings from being implemented and integrated into the application well in advance of August 14, 2024, as they were technologically available, feasible, and necessary to make Snapchat reasonably safe for use by children, such as Henry.

102.    Without these measures, and other reasonable design changes and warnings to users, Snapchat is unreasonably dangerous and defective.

103.    Were it not for the impact Snapchat had on Henry's social development, emotions, mind, and psyche by way of its addictive design, its lack of age and identity verification, lack of parental controls, and lack of warnings about the risks Snapchat posed, Henry would not have suffered the harm he did as set forth herein.

<u>**FIRST CAUSE OF ACTION**</u>

**NEGLIGENCE**

**(Against All Defendants)**

104.    Plaintiffs incorporate by reference the preceding paragraphs 1 through 103 as if the same were set forth fully herein.

105.    The negligence and carelessness of Defendants Snap, Inc., its agents, servants, workmen, and/or employees, and DOES 1 through 50, consists of, but is not limited to, the following:

a.    Failure to design, manufacture, fabricate, assemble, and install appropriate safety features, including age verification, identity verification, and parental controls on Snapchat to protect underaged users, like Henry;

b.    Failure to design, manufacture, fabricate, and assemble Snapchat in a manner that is not addictive and does not cause mental illness;

c.    Failure to warn Henry that Snapchat is addictive and causes mental illness;

COMPLAINT FOR DAMAGES                    **Exhibit A - 27**

d.  Failure to design, manufacture, fabricate, and assemble Snapchat in a manner that does not encourage connections with unknown users and/or impersonators that intend to cause harm;

e.  Failure to warn Henry that usage of Snapchat can result in dangerous contact with unknown users and/or impersonators that intend to cause harm;

f.  Failure to warn Henry that usage of Snapchat creates a risk of catfishing and sextortion on the application;

g.  Failure to implement "technical signals" to identify impersonators, scammers, and sextortionists and their accounts to prevent individuals from opening and operating accounts solely for the purpose of engaging in improper activity towards users, like Henry;

h.  Failure to warn Henry that fake accounts used for improper purposes have been routinely identified on Snapchat;

i.  Failure to conduct a sufficient investigation into the creation and operation of the sextortionist's account;

j.  Failure to require identity verification from the sextortionist that would ensure the account is being created by a real person for a proper purpose;

k.  Failure to design and/or implement warnings before users, like Henry, are permitted to send compromising images, including warnings that, among other things, the recipient user may not be who they say they are; may take screen-shots of the messages; may use the images for sextortion; may forward the images or publish them without consent and/or knowledge; and that the users profile and accounts should be viewed carefully to ensure it is not an impersonator account;

l.  Failure to design and implement features that reasonably restrict the sharing of nude images and/or other reasonable nudity protection measures and/or warnings to prevent users, like Henry, from sharing explicit photos with impersonators and/or sextortionists;

COMPLAINT FOR DAMAGES                                    **Exhibit A - 28**

m.  Failure to provide a quick, dedicated option for help and/or immediate resources to individuals, like Henry, who have been threatened, harassed, or cyberbullied through the application;

n.  Failure to warn users, like Henry, that they may receive messages from impersonators and that such accounts may be associated with fraudulent activity;

o.  Failure to implement default protective limits regarding the time, length, and frequency of use of Snapchat;

p.  Failure to implement opt-in restrictions to the length and frequency of use;

q.  Failure to implement self-limiting tools, including, but not limited, to session time notifications warnings, or reports; and

r.  Other negligent acts as shall be revealed in discovery.

106.  Prior to placing Snapchat into the stream of commerce, Defendants, and each of them, knew or should have known that Snapchat was in a defective and dangerous condition and that because of this defect, Snapchat could not be used safely for the purposes for which it was intended.

107.  The negligence, carelessness, recklessness, and/or outrageous conduct of Defendants Snap, and its agents, servants, workmen and/or employees, and DOES 1 through 50, as set forth herein, was a proximate cause of the emotional harm, physical injuries and damages suffered by Plaintiffs, including, but not limited to, emotional distress, physical harm, and wrongful death suffered by Henry as well as medical, funeral, and burial expenses, loss of earning capacity, and the loss of his society, companionship, and services.

108.  The foregoing conduct of Defendants, and each of them, also constitutes malice, oppression, and/or fraud, entitling Plaintiffs to punitive damages.

## SECOND CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – DESIGN DEFECT

**(Against All Defendants)**

109.  Plaintiffs incorporate by reference the preceding paragraphs 1 through 108 as if the same were set forth fully herein.

- 22 -
COMPLAINT FOR DAMAGES                                    **Exhibit A - 29**

110.    At all times relevant hereto, Defendant Snap Inc.'s Snapchat application was advertised, marketed, manufactured, designed, fabricated, assembled, sold, distributed, and/or otherwise placed into the stream of commerce by Snap during and in the ordinary course of business.

111.    Defendant Snap's design, development, manufacturing, management, operation, testing, control, production, marketing, and/or advertisement of Snapchat is inherently and purposely defective.

112.    Snapchat as well as its components (including its algorithms, product features, and any associated warnings) was used by Henry in an intended and foreseeable manner.

113.    Henry suffered injury and wrongful death while using Snapchat in a condition substantially unchanged from that in which Snapchat was advertised, marketed, manufactured, designed, fabricated, assembled, sold, distributed, and/or otherwise placed into the stream of commerce.

114.    Defendants Snap, Inc. and DOES 1 through 50 are strictly liable, as Snapchat was defective and unreasonably dangerous at the time of its distribution and Defendants failed to warn Henry of the aforementioned defects and dangers.

115.    Prior to the incident involving Henry, Defendants, and each of them, knew or should have known with adequate design, inspection, and/or testing that the products were in a defective and dangerous condition and that because of the defects, Snapchat could not be used safely for the purposes for which it was intended.

116.    Alternative designs were available that would reduce the defective and unreasonably dangerous condition of Snapchat.

117.    The injuries, damages, and wrongful death sustained by Henry as set forth above were the direct result of the defective and dangerous conditions existing at the time of the advertising, marketing, design, manufacture, fabrication, assembly, sale, and/or distribution by Defendants, and each of them, including, without limitation, that Snapchat was addictive and did not contain adequate or sufficient design protections to prevent individuals such as impersonators and/or sextortionists from utilizing Snapchat to target underaged individuals such as Henry.

COMPLAINT FOR DAMAGES          **Exhibit A - 30**

118.    Snapchat's dangerously defective design features, as set forth herein, was a proximate cause of the injuries and damages suffered by Plaintiffs including, but not limited to, emotional distress, physical harm, and wrongful death suffered by Henry as well as medical, funeral, and burial expenses, loss of earning capacity, and the loss of his society, companionship, and services.

119.    The foregoing conduct of Defendants, and each of them, also constitutes malice, oppression, and/or fraud, entitling Plaintiffs to punitive damages.

### THIRD CAUSE OF ACTION

### NEGLIGENCE – DESIGN DEFECT

### (Against All Defendants)

120.    Plaintiffs incorporate by reference the preceding paragraphs 1 through 119 as if the same were set forth fully herein.

121.    At all times relevant hereto, Defendant Snap, Inc.'s Snapchat application was advertised, marketed, manufactured, designed, fabricated, assembled, sold, distributed, and/or otherwise placed into the stream of commerce by Snap during and in the ordinary course of business.

122.    Defendant Snap's design, development, manufacturing, management, operation, testing, control, production, marketing, and/or advertisement of Snapchat is inherently and purposely defective.

123.    Snapchat as well as its components (including its algorithms, product features, and any associated warnings) was used by Henry in an intended and foreseeable manner.

124.    Henry suffered injury and wrongful death while using Snapchat in a condition substantially unchanged from that in which Snapchat was advertised, marketed, manufactured, designed, fabricated, assembled, sold, distributed, and/or otherwise placed into the stream of commerce.

125.    Defendants Snap, Inc. and DOES 1 through 50 are negligent, as Snapchat was defective and unreasonably dangerous at the time of its distribution and Snap failed to warn Henry of the aforementioned defects and dangers.

126.    Prior to the incident involving Henry, Defendants, and each of them, knew or should have known with adequate design, inspection, and/or testing that the products were in a defective and

1  dangerous condition and that because of the defects, Snapchat could not be used safely for the

2  purposes for which it was intended.

3       127.    The injuries, damages, and wrongful death sustained by Henry as set forth above were

4  the direct result of the defective and dangerous conditions existing at the time of the advertising,

5  marketing, design, manufacture, fabrication, assembly, sale, and/or distribution by Defendants, and

6  each of them, including, without limitation, that Snapchat was addictive and did not contain adequate

7  or sufficient design protections to prevent individuals such as impersonators and/or sextortionists

8  from utilizing Snapchat to target underaged individuals such as Henry.

9       128.    Snapchat's dangerously defective design features, as set forth herein, was a proximate

10  cause of the injuries and damages suffered by Plaintiffs including, but not limited to, emotional

11  distress, physical harm, and wrongful death suffered by Henry as well as medical, funeral, and burial

12  expenses, loss of earning capacity, and the loss of his society, companionship, and services.

13       129.    The foregoing conduct of Defendants, and each of them, also constitutes malice,

14  oppression, and/or fraud, entitling Plaintiffs to punitive damages.

15                     **FOURTH CAUSE OF ACTION**

16              **STRICT PRODUCTS LIABILITY – FAILURE TO WARN**

17                       **(Against All Defendants)**

18       130.    Plaintiffs incorporate by reference the preceding paragraphs 1 through 129 as if the

19  same were set forth fully herein.

20       131.    Defendant Snap, Inc.'s product, Snapchat, is dangerous, to an extent beyond that

21  contemplated by the ordinary user who uses Snap's product, because Snap encourages unhealthy,

22  addictive engagement, and compulsive use and lacked appropriate safety features such as age

23  verification, identity verification, and parental controls.

24       132.    Defendants, and each of them, had actual knowledge of the dangers and harms

25  associated with the design, engineering, and programming of its product.

26       133.    The dangerous design defect of Defendant Snap's product leads to overexposure and

27  vulnerability to scams, such as catfishing and sextortion.

28

- 25 -

134.    Defendants, and each of them, failed to provide adequate instructions or warnings to Henry that the defective product was defective and not reasonably safe.

135.    Defendants Snap, Inc. and DOES 1 through 50 sold and distributed this product to users in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of addictive engagement, compulsive use, and impulsive decision-making, which can lead to a cascade of harms, including, but not limited to, social isolation, increased risk-taking behavior, overexposure and desensitization to sexual content, catfishing, sextortion, and other harmful effects.

136.    Defendant Snap's product is defective and unreasonably dangerous because, among other reasons described herein, Snap failed to exercise reasonable care to inform Henry that, among other things:

a.    Snap's product causes addiction, compulsive use, and/or other concomitant physical and mental injuries;

b.    Snap's product harvests and utilizes user data in such a way that increases a user's risk of addiction to the product and concomitant physical and mental injuries;

c.    The algorithmically-targeted feeds in Snap's product is designed to promote increasingly stimulative and sexual content to encourage compulsive engagement by the user, raising the risk of mental health harms, including, but not limited to, damage to developing brains, social isolation, impulsive decision-making, increased risk-taking behavior, and desensitization;

d.    The likelihood and severity of harms is greater for minors and young adults;

e.    The likelihood and intensity of these harmful effects is exacerbated by the interaction of the product's features with one another, and by algorithms and other source code design that is currently publicly unknown and hidden from the users and the government;

f.    By design, algorithms prioritize content that generates high levels of intense emotion, like sexual content;

COMPLAINT FOR DAMAGES                                          Exhibit A - 33

g.   Advertisers leverage algorithms to identify and target vulnerable individuals who may be susceptible to various schemes, including sextortion; and

h.   There was a lack of reasonable design features to keep underaged users safe such as age verification, identity verification, and parental controls.

137.   Sufficient warnings from Defendants could have prevented the risks and harms referenced in this Complaint—or would have caused his parents to apprehend those risks or harms so that they could help him avoid those consequences—but Defendants, and each of them, chose not to warn despite its awareness of these risks and harms.

138.   Defendants, and each of them, are strictly liable, as Snapchat was defective and unreasonably dangerous at the time of its distribution and Defendants failed to warn Henry of the aforementioned defects and dangers.

139.   As a direct and proximate result of Defendants' failure to warn, Henry was the victim of a sextortion scheme and harassment that ultimately led to his suicide.

140.   Defendants' failure to adequately warn was a direct and proximate cause of Henry's death.

141.   Defendants' failure to warn of Snapchat's dangerously defective design features, as set forth herein, was a proximate cause of the injuries and damages suffered by Plaintiffs including, but not limited to, emotional distress, physical harm, and wrongful death suffered by Henry as well as medical, funeral, and burial expenses, loss of earning capacity, and the loss of his society, companionship, and services.

142.   The foregoing conduct of Defendants, and each of them, also constitutes malice, oppression, and/or fraud, entitling Plaintiffs to punitive damages.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE – FAILURE TO WARN

#### (Against All Defendants)

143.   Plaintiffs incorporate by reference the preceding paragraphs 1 through 142 as if the same were set forth fully herein.

144.    Defendant Snap Inc.'s product, Snapchat, is dangerous, to an extent beyond that contemplated by the ordinary user who uses Snap's product, because Snap encourages unhealthy, addictive engagement, and compulsive use and lacked appropriate safety features such as age verification, identity verification, and parental controls.

145.    Defendants Snap and DOES 1 through 50 had actual knowledge of the dangers and harms associated with the design, engineering, and programming of its product.

146.    The dangerous design defect of Defendant Snap's product leads to overexposure and vulnerability to scams, such as catfishing and sextortion.

147.    Defendants, and each of them, failed to provide adequate instructions or warnings to Henry that its defective product was defective and not reasonably safe.

148.    Defendants Snap and DOES 1 through 50 sold and distributed its product to users in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of addictive engagement, compulsive use, and impulsive decision-making, which can lead to a cascade of harms, including, but not limited to, social isolation, increased risk-taking behavior, overexposure and desensitization to sexual content, catfishing, sextortion, and other harmful effects.

149.    Defendant Snap's product is defective and unreasonably dangerous because, among other reasons described herein, Snap failed to exercise reasonable care to inform Henry that, among other things:

    a.  Snap's product causes addiction, compulsive use, and/or other concomitant physical and mental injuries;

    b.  Snap's product harvests and utilizes user data in such a way that increases a user's risk of addiction to the product and concomitant physical and mental injuries;

    c.  The algorithmically-targeted feeds in Snap's product is designed to promote increasingly stimulative and sexual content to encourage compulsive engagement by the user, raising the risk of mental health harms, including, but not limited to, damage to developing brains, social isolation, impulsive decision-making, increased risk-taking behavior, and desensitization;

d.   The likelihood and severity of harms is greater for minors and young adults;

e.   The likelihood and intensity of these harmful effects is exacerbated by the interaction of the product's features with one another, and by algorithms and other source code design that is currently publicly unknown and hidden from the users and the government;

f.   By design, algorithms prioritize content that generates high levels of intense emotion, like sexual content;

g.   Advertisers leverage algorithms to identify and target vulnerable individuals who may be susceptible to various schemes, including sextortion; and

h.   There was a lack of reasonable design features to keep underaged users safe such as age verification, identity verification, and parental controls.

150.   Sufficient warnings from Defendants could have prevented the risks and harms referenced in this Complaint—or would have caused his parents to apprehend those risks or harms so that they could help him avoid those consequences—but Defendants, and each of them, chose not to warn despite its awareness of these risks and harms.

151.   Defendants, and each of them, are liable, as Snapchat was defective and unreasonably dangerous at the time of its distribution and Defendants failed to warn Henry of the aforementioned defects and dangers.

152.   As a direct and proximate result of Defendants' failure to warn, Henry was the victim of a sextortion scheme and harassment that ultimately led to his suicide.

153.   Defendants' failure to adequately warn was a direct and proximate cause of Henry's death.

154.   Defendants' failure to warn of Snapchat's dangerously defective design features, as set forth herein, was a proximate cause of the injuries and damages suffered by Plaintiffs including, but not limited to, emotional distress, physical harm, and wrongful death suffered by Henry as well as medical, funeral, and burial expenses, loss of earning capacity and the loss of his society, companionship, and services.

COMPLAINT FOR DAMAGES                                          **Exhibit A - 36**

155.    The foregoing conduct of Defendants, and each of them, also constitutes malice, oppression, and/or fraud, entitling Plaintiffs to punitive damages.

## SIXTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

### (Against All Defendants)

156.    Plaintiffs incorporate by reference the preceding paragraphs 1 through 155 as if the same were set forth fully herein.

157.    Defendants Snap and DOES 1 through 50 impliedly warranted Snapchat was safe for the particular purpose for which it was made.

158.    Defendants' breach of implied warranty consisted of, inter alia, selling a defective and dangerous product.

159.    Henry relied on the skill, judgment, representations, and foregoing implied warranty of Defendants. Said warranties and representations were false in that Snapchat was not safe; was un-merchantable; and was unfit for the ordinary purpose and uses for which it was intended and caused Henry's injuries and death.

160.    Prior to Henry's usage of Snapchat, Defendants, and each of them, had implied to the general public that Snapchat was of merchantable quality and safe and fit for the use for which it was intended.

161.    Snapchat was neither safe for its intended use nor of merchantable quality as warranted by Defendants, and each of them, in that it had dangerous propensities when put to its intended use and would cause severe injuries and damages sustained by Henry as set forth herein.

162.    Defendants' breach of implied warranty, as set forth herein, was a proximate cause of the injuries and damages suffered by Plaintiffs including, but not limited to, emotional distress, physical harm, and wrongful death suffered by Henry as well as medical, funeral, and burial expenses, loss of earning capacity, and the loss of his society, companionship, and services.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SEVENTH CAUSE OF ACTION

### GROSS NEGLIGENCE

### (Against All Defendants)

163.    Plaintiffs incorporate by reference the preceding paragraphs 1 through 162 as if the same were set forth fully herein.

164.    At all relevant times, Defendants' conduct as described herein, including its actions and inactions alleged in Causes of Action 1 through 6, above, showed a reckless disregard for the safety of its users, particularly minors, and specifically, Henry.

165.    The gross negligence, recklessness, and/or outrageous conduct of Defendants Snap, and its agents, servants, workmen and/or employees, and DOES 1 through 5, as set forth herein was a proximate cause of the injuries and damages suffered by Plaintiffs including, but not limited to, emotional distress, physical harm, and wrongful death suffered by Henry as well as medical, funeral, and burial expenses, loss of earning capacity, and the loss of his society, companionship, and services.

166.    The foregoing conduct of Defendants, and each of them, also constitutes malice, oppression, and/or fraud, entitling Plaintiffs to punitive damages.

## EIGHTH CAUSE OF ACTION

### WRONGFUL DEATH

### (Against All Defendants)

167.    Plaintiffs incorporate by reference the preceding paragraphs 1 through 166 as if the same were set forth fully herein.

168.    Plaintiffs, and each of them, are the wrongful death beneficiaries of the decedent Henry James Masella Sluiter.

169.    As a direct and proximate result of Defendants' wrongful conduct and the defective nature of Snapchat, as set forth above, Plaintiffs have suffered damages including, but not limited to, funeral expenses, burial expenses, loss of financial support, loss of gifts and benefits, and loss of household services Henry would have provided. As well as non-economic damage including loss of love, companionship, comfort, care, assistance, protection, affection, and moral support, all in an amount according to proof at trial.

COMPLAINT FOR DAMAGES                                    **Exhibit A - 38**

170.    The foregoing conduct of Defendants, and each of them, also constitutes malice, oppression, and/or fraud, entitling Plaintiffs to punitive damages.

### NINTH CAUSE OF ACTION

### SURVIVAL ACTION

### (Against All Defendants)

171.    Plaintiffs incorporate by reference the preceding paragraphs 1 through 170 as if the same were set forth fully herein.

172.    Plaintiff Emily Sluiter is successor-in-interest to the decedent Henry James Masella Sluiter. (See Declaration of Emily Sluiter Pursuant to Code of Civil Procedure § 377.32, attached hereto as Exhibit "1".)

173.    As a direct and proximate result of Defendants' wrongful conduct and the defective nature of Snapchat, as set forth above, Henry suffered damages prior to death including medical expenses, economic losses, pain and suffering, emotional distress, and disfigurement. Plaintiff Emily Sluiter, as successor-in-interest, seeks recovery of these damages pursuant to California Civil Code of Procedure sections 377.30 and 377.34, in an amount according to proof at trial.

174.    The foregoing conduct of Defendants, and each of them, also constitutes malice, oppression, and/or fraud, entitling Plaintiffs to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants Snap, Inc. and DOES 1 through 50, inclusive, and respectfully request:

    a.    Compensatory damages;

    b.    Wrongful Death damages and Survival Action damages under California Code of Civil Procedure §§ 377.60, et seq.; 377.20, et seq.; and 377.30, et seq.;

    c.    Punitive damages where indicated, for Defendants' malicious, oppressive, and/or fraudulent conduct;

    d.    Pre- and post-judgment interest;

COMPLAINT FOR DAMAGES          **Exhibit A - 39**

1        e.   Costs and attorneys' fees; and

2        f.   Any such further and other relief as this Court deems just and proper.

3

4    DATED: January 30, 2026        **DICELLO LEVITT LLP**

5

6    By: _____

7        Doug Rochen (SBN 217231)
    drochen@dicellolevitt.com

8        **DICELLO LEVITT LLP**
    4747 Executive Drive, Suite 240

9        San Diego, California 92121
    Telephone: (619) 923-3939

10

11       Kenneth P. Abbarno*
    kabbarno@dicellolevitt.com

12       Justin Hawal*
    jhawal@dicellolevitt.com

13       **DICELLO LEVITT LLP**
    8160 Norton Parkway, Third Floor

14       Mentor, Ohio 44060
    Telephone: (440) 953-8888

15

16       Diandra S. Debrosse*
    fu@dicellolevitt.com

17       Mitchell W. Laing*
    mlaing@dicellolevitt.com

18       **DICELLO LEVITT LLP**
    505 20th Street N., Suite 1500

19       Birmingham, Alabama 35203
    Telephone: (205) 855-5700

20

21       Marc Lipton*
    marc@liptonlaw.com

22       Kyle Kelly*
    kyle@liptonlaw.com

23       **LIPTON LAW**
    18930 W. 10 Mile Road

24       Southfield, Michigan 48075
    Telephone: (248) 557-1688

25

26       Attorneys for Plaintiffs
    *Pro Hac Vice* application forthcoming

27

28

- 33 -

1

<u>**DEMAND FOR JURY TRIAL**</u>

2

Plaintiffs hereby demand a jury trial in the instant action on all claims of relief.

3

4      DATED: January 30, 2026                    **DICELLO LEVITT LLP**

5

6                                                          By: _____

7                                                          Doug Rochen (SBN 217231)
                                                           drochen@dicellolevitt.com

8                                                          **DICELLO LEVITT LLP**
                                                           4747 Executive Drive, Suite 240

9                                                          San Diego, California 92121
                                                           Telephone: (619) 923-3939

10

11                                                         Kenneth P. Abbarno*
                                                           kabbarno@dicellolevitt.com

12                                                         Justin Hawal*
                                                           jhawal@dicellolevitt.com

13                                                         **DICELLO LEVITT LLP**
                                                           8160 Norton Parkway, Third Floor

14                                                         Mentor, Ohio 44060
                                                           Telephone: (440) 953-8888

15

16                                                         Diandra S. Debrosse*
                                                           fu@dicellolevitt.com

17                                                         Mitchell W. Laing*
                                                           mlaing@dicellolevitt.com

18                                                         **DICELLO LEVITT LLP**
                                                           505 20th Street N., Suite 1500

19                                                         Birmingham, Alabama 35203
                                                           Telephone: (205) 855-5700

20

21                                                         Marc Lipton*
                                                           marc@liptonlaw.com

22                                                         Kyle Kelly*
                                                           kyle@liptonlaw.com

23                                                         **LIPTON LAW**
                                                           18930 W. 10 Mile Road

24                                                         Southfield, Michigan 48075
                                                           Telephone: (248) 557-1688

25

26                                                         Attorneys for Plaintiffs
                                                           *Pro Hac Vice* application forthcoming

27

28

- 34 -

COMPLAINT FOR DAMAGES                                      **Exhibit A - 41**

# EXHIBIT "1"

Doug Rochen (SBN 217231)
drochen@dicellolevitt.com
**DICELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, California 92121
Telephone: (619) 923-3939

Kenneth P. Abbarno*
kabbarno@dicellolevitt.com
Justin Hawal*
jhawal@dicellolevitt.com
**DICELLO LEVITT LLP**
8160 Norton Parkway, Third Floor
Mentor, Ohio 44060
Telephone: (440) 953-8888

Marc Lipton*
marc@liptonlaw.com
Kyle Kelly*
kyle@liptonlaw.com
**LIPTON LAW**
18930 W. 10 Mile Road
Southfield, Michigan 48075
Telephone: (248) 557-1688

Attorneys for Plaintiffs

*Pro Hac Vice* application forthcoming

[Additional counsel appear on signature line.]

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| EMILY SLUITER, individually and as successor-in-interest to HENRY JAMES MASELLA SLUITER, *deceased*; DOUGLAS SLUITER, AVERY SLUITER, and MORGAN SLUITER, each individually,<br><br>                    Plaintiffs,<br><br>        v.<br><br>SNAP, INC., a Delaware corporation, and DOES 1 through 50, inclusive,<br><br>                    Defendants. | Case No.:<br><br>**DECLARATION OF EMILY SLUITER PURSUANT TO CODE OF CIVIL PROCEDURE § 377.32** |

DECLARATION OF EMILY SLUITER PURSUANT TO CODE OF CIVIL PROCEDURE § 377.32

## **DECLARATION OF EMILY SLUITER**

I, Emily Sluiter, declare as follows:

1.      I am over the age of eighteen years old. I have personal knowledge of the facts contained in this declaration, and if called as a witness I could and would testify competently to the truth of the facts stated herein.

2.      I am the mother of decedent Henry James Masella Sluiter—a plaintiff to this action who died on August 16, 2024, in Grand Rapids, Kent County, Michigan. A certified copy of the decedent's death certificate is attached hereto as "Exhibit A".

3.      No proceeding is now pending in California for administration of the decedent's estate. An estate was opened in the State of Michigan. I was appointed personal representative in that proceeding by the Probate Court of Kent County, Michigan.

4.      I am the decedent's successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure) and succeed to the decedent's interest in this action.

5.      No other person has a superior right to commence the action or to be substituted for decedent Henry James Masella Sluiter in the pending action. All other persons with an equal or inferior right to bring such an action have been joined as plaintiffs herein.

6.      Recovery is sought in this action on behalf of the decedent for damages sustained prior to death, pursuant to Section 377.30 of the California Code of Civil Procedure. No distribution of the decedent's estate has been made that would conflict with prosecution of this action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 28, 2026, at Belmont, Michigan.

_____
EMILY SLUITER

DECLARATION OF EMILY SLUITER PURSUANT TO CODE OF CIVIL PROCEDURE § 377.32

**Exhibit A - 44**

# EXHIBIT "A"

# COUNTY OF KENT
## STATE OF MICHIGAN

202408260004321   Pgs:1 DC
08/26/2024 02:03 PM
Lisa Posthumus Lyons
Kent County Clerk/Register, MI

**STATE OF MICHIGAN**
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**CERTIFICATE OF DEATH**

**064326**
STATE FILE NUMBER

| 1. DECEDENT'S NAME (First, Middle, Last) | 2. DATE OF BIRTH | 3. SEX | 4. DATE OF DEATH |
|---|---|---|---|
| Henry James Masella Sluiter | June 19, 2010 | Male | August 16, 2024 |

| 5. NAME AT BIRTH OR OTHER NAME USED FOR PERSONAL BUSINESS | 6a. AGE- Last Birthday (Years) | 6b. UNDER 1 YEAR MONTHS | DAYS | 6c. UNDER 1 DAY HOURS | MINUTES |
|---|---|---|---|---|---|
| | 14 | | | | |

| 7a. LOCATION OF DEATH | 7b. CITY, VILLAGE OR TOWNSHIP OF DEATH | 7c. COUNTY OF DEATH |
|---|---|---|
| Helen DeVos Childrens Hospital | Grand Rapids | Kent |

| 8a. CURRENT RESIDENCE - STATE | 8b. COUNTY | 8c. LOCALITY |
|---|---|---|
| Michigan | | |

| 8e. ZIP CODE | 9. BIRTH PLACE | 10. SOCIAL SECURITY NUMBER | 11. DECEDENT'S EDUCATION |
|---|---|---|---|
| | Tiffin, Ohio | | 9th Grade |

| 12. RACE | 13a. ANCESTRY | | 13b. HISPANIC ORIGIN | 14. EVER IN THE U.S. ARMED FORCES? |
|---|---|---|---|---|
| White | American | | No | No |

| 15. USUAL OCCUPATION | 16. KIND OF BUSINESS OR INDUSTRY | 17. MARITAL STATUS | 18. NAME OF SURVIVING SPOUSE (if wife, give name before first married) |
|---|---|---|---|
| Not applicable | Not applicable | Never married | |

| 19. FATHER'S NAME (First, Middle, Last) | 20. MOTHER'S NAME BEFORE FIRST MARRIED (First, Middle, Last) |
|---|---|
| Douglas Paul Sluiter II | Emily B. Schuiling |

| 21a. INFORMANT'S NAME | 21b. RELATIONSHIP TO DECEDENT | 21c. MAILING ADDRESS |
|---|---|---|
| Douglas Paul Sluiter II | Father | |

| 22. METHOD OF DISPOSITION | 23a. PLACE OF DISPOSITION | 23b. LOCATION City or Village, State |
|---|---|---|
| Cremation | TLC Crematory | Grandville, Michigan |

| 24. SIGNATURE OF MORTUARY SCIENCE LICENSEE | 25. LICENSE NUMBER | 36. NAME AND ADDRESS OF FUNERAL FACILITY |
|---|---|---|
| Michael C. Matthysse | 4501006932 | MKD Stegenga Funeral Chapel - Belmont, 1601 Post Drive NE, Belmont, Michigan 49306 |

| 27a. CERTIFIER | 28a. ACTUAL OR PRESUMED TIME OF DEATH | 28b. PRONOUNCED DEAD ON | 28c. TIME PRONOUNCED DEAD |
|---|---|---|---|
| ☐ Certifying Physician - To the best of my knowledge, death occured due to the cause(s) and manner stated.  ☒ Medical Examiner - On the basis of examination, and/or investigation, in my opinion, death occured at the time, date, and place, and due to the cause(s) and manner stated.  Signature and Title  Stephen D Cohle, MD | 05:59 PM | August 16, 2024 | 05:59 PM |
| | 29. MEDICAL EXAMINER CONTACTED | 30. PLACE OF DEATH | 31. IF HOSPITAL |
| | Yes | Hospital | ICU |

| 27b. DATE SIGNED | 27c. LICENSE NUMBER | 32. MEDICAL EXAMINER'S CASE NUMBER | 33. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER |
|---|---|---|---|
| August 26, 2024 | 4301044823 | | |

34. NAME AND ADDRESS OF CERTIFYING PHYSICIAN
Stephen D Cohle, MD, Kent County ME, 1840 Wealthy SE Spectrum Health, Blodgett Campus, Grand Rapids, Michigan 49506

| 35a. REGISTRAR'S SIGNATURE | 35b. DATE FILED |
|---|---|
| *Lisa Posthumus Lyons* | August 26, 2024 |

| 36. PART I ENTER the chain of events- diseases, injuries or complications - that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest or ventricular fibrillation without showing the etiology. Enter only one cause on line. | | Approximate Interval Between Onset and Death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death). a. PART I ENTER the chain of events... death section, as underlying or contributing cause of death be sure to record diclariea in either Part I or Part II as the cause of death section. | a. Gunshot wound of the head | days |
| | DUE TO (OR AS A CONSEQUENCE OF) | |
| Sequentially list. IF ANY, leading to the listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST | b. | |
| | DUE TO (OR AS A CONSEQUENCE OF) | |
| | c. | |
| | DUE TO (OR AS A CONSEQUENCE OF) | |
| | d. | |

| PART II. OTHER SIGNIFICANT CONDITIONS contributing to death but not resulting in the underlying cause given in Part I | 37. DID TOBACCO USE CONTRIBUTE TO DEATH? ☐ Yes ☐ Probably ☒ No ☐ Unknown | 38. IF FEMALE ☐ Not pregnant within past year  ☐ Pregnant at time of death  ☐ Not pregnant, but pregnant within 42 days of death  ☐ Unknown if pregnant within the past year  ☐ Not pregnant, but pregnant 43 days to 1 year before death |
|---|---|---|

| 39. MANNER OF DEATH | 40a. WAS AN AUTOPSY PERFORMED? | 40b. WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? |
|---|---|---|
| Suicide | Yes | No |

| 41a. DATE OF INJURY | 41b. TIME OF INJURY | 41c. DESCRIBE HOW INJURY OCCURRED |
|---|---|---|
| 08/14/2024 | Unknown | Deceased shot himself in the head |

| 41d. INJURY AT WORK | 41e. PLACE OF INJURY | 41f. IF TRANSPORTATION INJURY | 41g. LOCATION |
|---|---|---|---|
| No | outside | | 6777 Blue Ridge Dr. NE, Belmont, Michigan 49306 |

I, LISA POSTHUMUS LYONS, CLERK OF KENT COUNTY DO HEREBY CERTIFY that the foregoing is a true and exact copy of the original document on file in the office of the County Clerk

*Lisa Posthumus Lyons*

**LISA POSTHUMUS LYONS**
KENT COUNTY CLERK/REGISTER

DATED:   AUG 27 2024

RBINCO (REV) 07/07



A070 24 195   **Exhibit A - 46**

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE
